THE INIZIATIVA.

JARVIS et al. v. THE INIZIATIVA.

(Circuit Court of Appeals, Second Circuit. August 1, 1893.)

1. NEGLIGENCE — EVIDENCE — LEAVING HEAVILY-LADEN LIGHTER WITHOUT WATCHMAN.

Libelants were owners of a lighter which was being loaded with sulphur alongside claimant's ship, under order from the consignees to take 100 tons. In answer to an inquiry the master of the lighter was informed that there was to be no night work that night, and about 6 P. M. the lightermen made the lighter fast alongside for the night, and went home, with the understanding that there was to be no night work. In their absence the ship's crew loaded the lighter to her full capacity, and at half past 9 they made her fast to the ship, and left her, without a watchman, exposed to the swells of passing boats, where she was found overturned the next morning. It was usual to have a night watchman on board this lighter, when heavily laden. By the bill of lading the sulphur was to be discharged into lighters furnished by the consignees, and was to be taken day and night as delivered by the ship. *Held,* that the ship was negligent in leaving the heavily-loaded lighter without a watchman during the night,

2. NEGLIGENCE—PROXIMATE CAUSE.

A heavily-laden lighter was left for the night, by a ship's crew, securely fastened to the ship, but without a watchman, and was found the next morning, overturned, with all the lines fastening her to the ship broken. *Held,* that the very strong probability of the accident being caused by the absence of a watchman was sufficient to justify a decree against the ship.

Appeal from the District Court of the United States for the Southern District of New York.

In Admiralty. Libel by Emeline P. Jarvis, James W. Gallison, and Forrest W. Gallison, owners of the lighter Overton, against the steamship Iniziativa, her engines, etc., for negligence. The district court rendered a decree for libelants. Respondent appeals. Affirmed.

J. W. Hyland, for libelants.
Lorenzo Ullo, for claimant.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. This is an appeal from a final decree of the district court for the southern district of New York in favor of the libelants, upon a libel in rem, to recover damages for negligence. The following outline of the undisputed facts was found by the district judge:

"At about half past 5 o'clock in the morning of October 5, 1891, the libelants' lighter Overton, fully loaded with about 98 tons of sulphur, and made fast alongside the steamship Iniziativa at the Mediterranean pier, Brooklyn, broke her lines, capsized, and sank. The libel was filed to recover damages for the loss of boat and cargo, on the ground that they were upset by the negligence of the Iniziativa. The libelants were engaged in the lighterage business in the harbor of New York. The consignees of the sulphur gave them an order on the steamship for 100 tons, the capacity of the lighter Overton, to be taken to Gowanus creek. The lighter arrived alongside the Iniziativa in the afternoon of October 7th, and up to a little before 6 P. M.

had taken on board 35 tons; namely, 20 tons, which filled the hold, and 15 tons on deck. The loading was done by hoisting the sulphur out of the ship upon a platform erected upon her rail, where the sulphur was weighed by a weigher employed by the consignee, and, after being weighed upon the platform, was shot down upon the lighter below. The bill of lading provided that the sulphur was 'to be discharged into lighters, which consignee is to furnish as requested by ship, and delivery to be taken day and night as ship delivers.' One of the printed clauses of the bill of lading also provided that the consignee was bound to be 'ready to receive the goods from the ship's side simultaneously with the ship being ready to unload, either on the wharf, or into lighter provided with a sufficient number of men to receive and stow the goods;' and in default thereof the master was authorized 'to enter the goods at the customhouse, and to land, warehouse, or place them in lighter, without notice to, and at the risk and expense of, the said consignee of the goods, after they leave the deck of the ship.' At about half past 5 P. M. the master of the lighter hailed the ship to know whether there was to be work at night; and the weigher replied, 'No;' that they were to knock off at 6 o'clock. Soon afterwards, the discharge being stopped, the three men on board the lighter made her fast, properly, alongside, for the night, and went home. Work was resumed at 7 P. M., but, the lightermen not being present, the foreman on the ship sent down a couple of men to trim the sulphur as it was dumped aboard, and the loading, up to ninety-eight tons, was completed at half past 9, when the men were discharged. The lighter was moved several times while loading in the evening. At half past 5 the next morning the noise of the upsetting of the lighter was heard. No one saw it upset, or testifies to the immediate cause. All the lines that fastened it to the ship were broken."

The theory of the libel is that the steamship was in fault in discharging more sulphur on the deck of the lighter in the absence of her master and crew, when notice had been given that work had ceased until the next day; in not trimming the cargo properly; and in not having a watchman to look after the safety of the lighter at night, after she had been heavily loaded. A majority of the court are of the opinion that there is no adequate evidence that the lighter was not properly trimmed.

The contested question of fact in the case was whether the lightermen knew, or ought to have known, that work was to proceed in the evening, and were consequently improperly absent. It is evident that at about half past 5 o'clock they were informed by the weigher that work would not be resumed in the evening; that subsequently the ship's men were informed that the work would go on; that the latter returned after supper to the vessel, and completed the discharge of the sulphur. The claimant insists that the lightermen were also notified at the interview with the ship's crew that work would be resumed, and either knew, or ought to have known, of this decision. The lightermen deny that they heard of any change in the plans for the night work, and they are corroborated by the weigher. It is also manifest that they had no objection to a continuance of the work, and that if they had supposed that the original plan had been changed they would have returned after supper, and received the 100 tons. We therefore concur with the district judge "that the lightermen left the lighter at about 6 o'clock with no notice that the ship was to work at night, but on the distinct understanding to the contrary." In their absence the lighter was loaded by the ship's crew to her full capacity, was probably very

deeply loaded at the stern, and was left without watchman or oversight at a place where she was exposed to the swells of passing boats. She was securely fastened to the steamship, but she was found capsized, with her keel against the ship's side, and her mast broken away, and hanging from the steamer. The accident was not caused by leakage. It was usual to have some one on board the lighter at night, when she was heavily laden. It is insisted by the claimant that, inasmuch as, under the bill of lading, the sulphur was to be discharged into lighters furnished by the consignees, and was to be taken day and night as delivered by the ship, and as the consignees were bound to be ready with an adequate number of men to receive and stow the goods, the steamship was rightfully delivering the cargo at night on board the lighter, and was not bound to look for the care and preservation of the sulphur after it left the ship's rails, or to have oversight of the lighter. In the view which we take of the case, it is not important to determine whether the delivery on board the lighter was to be considered as a delivery to the consignees, through their agents, or a delivery to purchasers from the consignees, who were thus receiving the sulphur under an independent contract, and we assume that, as claimed by the appellants, the delivery was to persons acting in the stead and capacity of consignees. If the consignees had refused to receive goods at night, or had refused to furnish men at night, and had been in default, a different question would have arisen; but the lighter was furnished with a competent number of men, whose absence in the evening was excusable upon the distinct understanding on their part that they should not return. The ship must have known that their absence was not willful or voluntary, but that, on the contrary, the consignees were ready to furnish men, and were not in default. In this state of facts, it was not improper for the ship, in her earnestness to complete the unloading, to load the lighter to her capacity, but, in the excusable absence of her caretakers, it was the duty of the ship to take such reasonable precautions and care of her as were necessary in order to protect her from damage during the night. If the consignees were not in default, and the ship used their property, it must be used with reasonable care. The ship was guilty of want of ordinary care in leaving the heavily-loaded lighter without attendance during the night, where she was exposed to danger.

But the claimant insists that, in order to find the ship guilty of a tort, it is not sufficient merely to prove that she was negligent, and that an accident occurred, but it must be shown that the negligence caused, or materially contributed to, the accident, and it is conceded that the immediate force or cause which produced the injury is unknown. The general principle which is invoked by the claimant is true, but the principle is satisfied when the plaintiff establishes by his "evidence circumstances from which it may fairly be inferred" that the accident was attributable to a want of precaution which the defendant was under obligation to have taken.

We do not know the particular agent which struck the blow that overturned the lighter. We do know that the injurious force was naturally to have been expected, was ordinarily provided against, and would probably have been averted had the claimant taken the precautions which he ought to have resorted to. Hayes v. Railroad Co., 111 U. S. 228, 4 Sup. Ct. Rep. 369; Daniel v. Railway Co., L. R. 5 H. L. 45. It is manifest that violence of some sort wrenched the lighter from the ship, and threw her over. The district judge thought it was probable that "she took in water from the swells of passing boats in the early morning, through her exposed situation, in the absence of any watch to guard against such dangers;" but, whatever created the violence, it is scarcely possible that the presence of a competent and attentive watchman would not have been able to deliver the boat from its effect. The probability that the calamity resulted from the absence of a watchman is very strong.

The decree of the district court is affirmed, with costs.